## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

|  |  |
|---|---|
| U.S. SPORTSMEN'S ALLIANCE FOUNDATION, | |
| THE MICHIGAN BEAR HUNTERS ASSOCIATION, | |
| UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, and | |
| WISCONSIN BEAR HUNTERS ASSOCIATION | |
| Plaintiffs, | |
| v. | Civil Action No. _____ |
| DEBRA HAALAND, Secretary of the U.S. Department of the Interior, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| MARTHA WILLIAMS, Director of the U.S. Fish and Wildlife Service, and | |
| U.S. FISH AND WILDLIFE SERVICE | |
| Defendants. | |

## INTRODUCTION

1.      U.S. Sportsmen's Alliance Foundation, The Michigan Bear Hunters Association, Upper Peninsula Bear Houndsmen Association, and Wisconsin Bear Hunters Association (collectively "Plaintiffs") bring this action against Defendant Debra Haaland, Secretary of the Interior, Defendant Martha Williams, Director of the U.S. Fish and Wildlife Service, and the U.S. Fish and Wildlife Service ("the Service") (collectively "Defendants") for violation of the Service's mandatory duty under the Endangered Species Act ("ESA") to make a "90-day finding" and a "12-month

finding" on two petitions regarding gray wolves (*canis lupus*).

2.    On June 29, 2023, Plaintiffs filed two petitions with Defendants in accordance with 16 U.S.C. § 1533(b), 5 U.S.C. § 553(e), and 50 C.F.R. § 424.14(a). The first petition asked the Service to designate and delist a Western Great Lakes Distinct Population Segment of gray wolves. The second petition asked the Service to recognize a West Coast Wolf Distinct Population Segment, to downlist that West Coast Distinct Population Segment from endangered to threatened, and to keep any other remnant wolf populations listed.

3.    Within 90 days of receiving a petition, the Service must make a "finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). This is commonly referred to as a "90-day finding."

4.    If the Service makes a positive 90-day finding, meaning that the petitioned action may be warranted, the ESA further requires the Service to make what is commonly referred to as a "12-month finding," which is a finding as to whether the petitioned action is not warranted, warranted, or warranted but precluded by other higher priority actions. This finding must be made within 12 months of receiving the petition. 16 U.S.C. § 1533(b)(3)(B).

5.    The Service has violated its nondiscretionary duties under the ESA. It has not made any 90-day or 12-month findings on the petitions. This lawsuit seeks to force the Service to make its overdue findings.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 16 U.S.C. §§ 1540(c), (g)(1)(C) (ESA citizen suit provision), and 5 U.S.C. § 702 (review of agency action under the Administrative Procedure Act ("APA")).

7.    More than 60 days ago, on November 9, 2023, Plaintiffs provided Defendant Haaland

and Defendant Williams with written notice of the Service's failure to timely make a 90-day finding on the two petitions under the ESA, and their intent to file suit seeking redress of those violations in accordance with 16 U.S.C. § 1540(g)(2). *See* Attachment A. That notice was provided by both electronic and certified mail. Plaintiffs received a response from the Service dated March 6, 2024, acknowledging that the 90-day findings had not been made. *See* Attachment B.

8.    More than 60 days ago, on July 2, 2024, Plaintiffs provided Defendant Haaland, Defendant Williams, and a Service staff member, Rachel London, Branch of Delisting and Foreign Species, with a separate written notice of the Service's failure to timely make that 90-day finding, failure to timely make a 12-month finding, and notifying Defendants of Plaintiffs' intent to file suit seeking redress of those violations in accordance with 16 U.S.C. § 1540(g)(2). That notice was provided by both electronic and certified mail *See* Attachment C. Plaintiffs received another letter from the Service on August 13, 2024. *See* Attachment D. That letter acknowledges that the Service received the second notice of intent to sue on July 2, 2024. That letter also states: "The 90-day and 12-month findings for your gray wolf petitions are some of the many outstanding actions that we must complete. We ask that you please refrain from filing suit at this time."

9.    The Service has not corrected its violations of the ESA by making the overdue findings on the two petitions, nor has it committed to a timeline to remedy its violations. Accordingly, an actual controversy exists between the parties, and the requested relief is proper under the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202, the APA, 5 U.S.C. §§ 701–706, and the ESA, 16 U.S.C. §1540(g).

10.    Venue properly lies in the United States District Court for the Western District of Michigan under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e)(1). This action is brought against a federal agency and officers of the United States in their official capacity, a substantial part of the

3

events giving rise to the Plaintiffs' claims occurred in this district, Plaintiff Upper Peninsula Bear Houndsmen Association resides in this district, and Plaintiff Sportsmen's Alliance Foundation has members who reside in this district.

## PARTIES

11.    Plaintiff U.S. Sportsmen's Alliance Foundation is a non-profit organization under § 501(c)(3) of the Internal Revenue Code, headquartered in Columbus, Ohio. It is dedicated to promoting and educating the public about our hunting, fishing, and trapping heritage, and science-based wildlife management. Sportsmen's Alliance Foundation achieves its mission through public education and issue research conducted both on its own and through partnerships with local sportsmen and conservation organizations. It also engages in litigation when necessary to protect the beneficial pursuits of hunting, trapping, fishing, and scientific wildlife management practices.

12.    Sportsmen's Alliance Foundation has organizational members, including its parallel entity, the U.S. Sportsmen's Alliance, a § 501(c)(4) non-profit, also headquartered in Columbus, Ohio, whose membership consists of individuals across the country, including individuals who reside in the Western Great Lakes Region, that have been affected by the gray wolf's status under the ESA.

13.    Plaintiff Michigan Bear Hunters Association is based in Otsego County, Michigan. It was founded in 1946, when Ben East, a famous writer for *Outdoor Life* magazine, realized his dream to hold a bear hunt in the Dead Stream Swamp, near Cadillac, Michigan. More than 100 people showed up for that first organized hunt, from as far away as Tennessee. Soon after that hunt, the Cadillac Bear Club transformed itself into The Michigan Bear Hunters Association. The Michigan Bear Hunters Association believes that black bears and their habitat need to be preserved. Its members have had dogs killed by wolves and have seen a drop in the bear population with the increase in the Michigan wolf population.

4

14.    Plaintiff Upper Peninsula Bear Houndsmen Association was founded in 1985, and is located in Menominee County, Michigan. It is dedicated to preserving bear hunting, conservation education, and the right to hunt. Its members have had dogs killed by wolves. Some members will not go hunting in the Upper Peninsula because they fear they will lose their dogs to wolves.

15.    Plaintiff Wisconsin Bear Hunters Association is based in Madison, Wisconsin. For nearly 50 years, it has been dedicated to protecting the rights of sportsmen and sportswomen in Wisconsin and promoting youth hunting, conservation, and sound state-led wildlife management. Wisconsin Bear Hunters Association members have had dogs killed by wolves. They have also seen their hunting opportunities diminished due to wolves killing bear cubs while the cubs are denning.

16.    Defendant Debra Haaland is the Secretary of the United States Department of the Interior. She has ultimate responsibility for implementation of the ESA as it relates to the gray wolf. Secretary Haaland is sued in her official capacity.

17.    Defendant Martha Williams is the Director of the U.S. Fish and Wildlife Service. The Service is the federal agency to which the Department of Interior has delegated the responsibility of implementing the ESA and its regulations with respect to listing and delisting terrestrial species. *See* 50 C.F.R. § 402.01(b). Director Williams is sued in her official capacity.

18.    Defendant U.S. Fish and Wildlife Service ("the Service") is a federal agency within the United States Department of the Interior. Through delegation of authority from the Secretary of Interior, the Service administers and implements the ESA and is legally responsible for the protection and management of ESA-listed terrestrial species, including the gray wolf.

## LEGAL FRAMEWORK

19.    The states own the wildlife in their sovereign capacity in "a trust for the benefit of the people." *Geer v. State of Conn.,* 161 U.S. 519, 529 (1896), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979). This is commonly referred to as the "public trust doctrine,"

and it has been codified in many statutes. *See*, *e.g.*, Mich. Comp. Laws §§ 324.40105, 324.47301; Minn. Stat. § 97A.025; Wis. Stat. § 29.011(1).

20.    Congress, however, enacted the ESA "to provide a program for the conservation of … endangered species and threatened species" and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

21.    The ESA defines "conserve" and "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

22.    Section 4 of the ESA requires the Secretary to list a species as either threatened or endangered when it meets the statutory listing criteria. 16 U.S.C. § 1533.

23.    Under the ESA, a "'species' includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). A "'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). And an "'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

24.    The Secretary is charged with listing a species as threatened or endangered "solely on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), whenever listing is warranted based on any one of the following five listing factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c). The Secretary has delegated her responsibilities

under the ESA to the Service. 50 C.F.R. § 402.1(b).

25.    The Service must delist a species when (1) it is extinct, (2) it has recovered to the point where it no longer meets the definition of threatened or endangered under those five factors, (3) new information shows that the listed species is not a endangered or threatened species, or (4) new information shows that the listed species is not a "species" under the ESA. 50 C.F.R. § 424.11(e). The decision to list or delist must consider efforts of the States to conserve the species. 50 C.F.R. § 424.11(g).

26.    Congress did not intend for endangered or threatened species to be listed in perpetuity. The ESA requires the Service to "from time to time revise" its listings "to reflect recent determinations, designations, and revisions." 16 U.S.C. § 1533(c)(1). Further, every five years, the Service must "review … and determine … whether any [listed] species should … be removed … or changed in status." 16 U.S.C. § 1533(c)(2)(A)-(B).

27.    Any interested person can initiate a listing change by filing a petition with the Service. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

28.    The ESA mandates that, upon receiving a citizen listing petition, the Service must make a finding as to whether the petition presents "substantial scientific or commercial information indicating that the listing may be warranted." 16 U.S.C. § 1533(b)(3)(A). "'[S]ubstantial scientific or commercial information' refers to credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i).

29.    This finding is to be made within 90 days of receipt of the listing petition, "to the maximum extent practicable." 16 U.S.C. § 1533(b)(3)(A). Multiple courts have ruled that although there is some flexibility with the timing on the 90-day finding, it must be made before the 12-

month finding required by 16 U.S.C. § 1533(b)(3)(A), i.e., "[w]ithin 12 months after receiving the petition." *See Friends of Animals v. Ashe*, 808 F.3d 900, 902–03 (D.C. Cir. 2015) (Kavanaugh, J.); *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, 1175–76 (9th Cir. 2002). The purpose of the deadline is to "force action on listing and delisting proposals." H.R. Conf. Rep. No. 97–835, at 21 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2862.

30.    The 90-day finding must be published in the Federal Register. 50 C.F.R. § 424.14(h)(1).

31.    The Service regularly fails to meet its deadlines. A 2017 report from the U.S. Government Accountability Office found that between fiscal years 2005 through 2015, the Service (and the National Marine Fisheries Service, which has ESA jurisdiction over saltwater fish) was sued 141 times for missing deadlines on petitions involving 1,441 species.[1]

32.    If the 90-day finding is positive, the Service must review the species' status and make one of three additional findings within 12 months of receiving the petition: the listing (i) is not warranted; (ii) is warranted; or (iii) is warranted but precluded from listing by pending proposals concerning species of higher priority. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(h)(2).

33.    There is no flexibility with the deadline for making the 12-month finding: it must be made within "12 months from the date of the petition filing." *Friends of Animals*, 808 F.3d at 903; *Badgley*, 309 F.3d at 1177.

34.    If the Service makes a warranted 12-month finding, it must publish that finding in the Federal Register with "the text of a proposed regulation to implement [the] action." 16 U.S.C. § 1533(b)(3)(B)(ii). And within one year of publishing the proposed regulation, the Service must publish a final rule implementing its decision. 16 U.S.C. § 1533(b)(6)(A).

---

[1] The report is available at https://www.gao.gov/assets/gao-17-304.pdf (last visited August 23, 2024).

35.   Under the ESA's citizen suit provision, "any person may commence a civil suit … against the Secretary where there is an alleged failure of the Secretary to perform any act or duty under section 1533 … which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C).

36.   The APA further authorizes courts to "compel agency action[s] unlawfully withheld or unreasonably delayed" 5 U.S.C. § 706(1). An "agency action" includes the "failure to act." 5 U.S.C. § 551(13).

## FACTUAL BACKGROUND

### GRAY WOLVES

37.   "Gray wolves (Canis lupus) are the largest wild members of Canidae, or dog family, with adults ranging in weight from 18 to 80 kilograms (40 to 175 pounds), depending on sex and geographic locale."[2]

38.   Gray wolves' range includes North America, Europe, and Asia. *Id*. The wide range of habitats in which wolves can thrive reflects their adaptability as a species and includes temperate forests, mountains, tundra, taiga, grasslands, and deserts. *Id*.

39.   Their long legs make them well-adapted to running, which allows them to cover long distances quickly in search of food. *Id*. They also have keen senses of smell, hearing, and vision, which they use to detect prey. *Id*.

40.   Wolves also reproduce and expand quickly. "Females and males typically begin breeding as 2-year olds and may annually produce young until they are over 10 years old." 74 Fed. Reg. 15123, 15123 (April 2, 2009). "Litters are born from early April into May; they range from 1 to 11 pups, but generally include 4 to 6 pups." 76 Fed. Reg. 26086, 26095 (May 5, 2011). "Normally a pack has a single litter annually, but the production of 2 or 3 litters in one year has been routinely

---

[2] *See* https://www.fws.gov/species/gray-wolf-canis-lupus (last visited August 29, 2024).

documented in Yellowstone National Park." *Id*. "Yearling wolves frequently disperse from their natal packs" in search of "suitable unoccupied habitat and a member of the opposite sex." *Id*. "These dispersal movements allow a wolf population to quickly expand and colonize areas of suitable habitat that are nearby or even those that are isolated by a broad area of unsuitable habitat." *Id*.

### PRIOR LISTINGS AND DELISTINGS

41.     The gray wolf "is one of [the ESA's] success stories." *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69, 81 (D.D.C. 2014), *aff'd sub nom. Humane Soc'y of United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017). "By the 1930's wolves were nearly erased from the lower 48 states as a result of one of the most effective eradication campaigns in modern history." *Id*. (citation and quotations omitted). But in 2020, the Service concluded that there were 4,200 wolves in the Western Great Lakes Region alone, which were directly connected with another 12,000-14,000 wolves in Eastern Canada. *See* 85 Fed. Reg. 69778, 69788 (Nov. 3, 2020). When the petitions were filed a year ago, the Western Great Lakes population estimate was 4,294. *See* Petition at 12. The current estimated wolf population in the region is 4,688 wolves (762 in Michigan[3]; 1007

---

[3] https://www.michigan.gov/dnr/about/newsroom/releases/2024/06/13/latest-dnr-survey-shows-stable-wolf-population-in-michigan (last visited August 28, 2024). This is an underestimate of the true wolf population. According to a Michigan Department of Natural Resources Carnivore Specialist, the estimate is low because it was taken during the winter, a time where wolf numbers tend to drop because of the natural conditions and before the pups are born in the spring. *See* https://www.wxpr.org/energy-environment/2024-07-05/u-p-wolf-population-at-carrying-capacity-michigan-dnr-advocates-for-delisting-species (last visited August 28, 2026). Wolves are also at their carrying capacity in the Upper Peninsula right now. *Id*.

in Wisconsin[4]; and 2,919 in Minnesota[5]).

42.    Gray wolves were first listed as a threatened species as the "timber wolf" (*Canis lupus lycaon*) under the Endangered Species Preservation Act of 1966, the predecessor to the ESA. 32 Fed. Reg. 4001 (Mar. 11, 1967). Another subspecies of wolf, the Northern Rocky Mountain wolf (*Canis lupus irremotus*) was listed in 1973. 38 Fed. Reg. 14,678 (June 4, 1973). And two other subspecies of wolves (*Canis lupus baileyi* and *Canis lupus monstrabilis*) were listed in 1976. 41 Fed. Reg. 17,736, 17,737 (Apr. 28, 1976); 41 Fed. Reg. 24,062, 24,066 (June 14, 1976).

43.    Then in 1978, the Service moved away from its subspecies level listings and listed the gray wolf as threatened in Minnesota and endangered throughout the remainder of the conterminous 48 states. S*ee* 43 Fed. Reg. 9607, 9608 (Mar. 9, 1978).

44.    In accordance with 16 U.S.C. § 1533(f)(1), the Service established a gray wolf recovery plan in 1978, and then revised it in 1992. *See*, *e.g.*, 85 Fed. Reg. 69778, 69791 (Nov. 3, 2020). Those plans contain recovery criteria that indicate when the wolf has been recovered in the Eastern United States. *Id.* The criteria are "(1) a secure wolf population in Minnesota, and (2) a second population outside Minnesota and Isle Royale consisting of 100 wolves within 100 mi (160 km) of Minnesota for 5 successive years." *Id.*

45.    These wolves have surpassed those recovery criteria for over 20 years. *Id.* In 2020, the Service concluded that "this region contains sufficient wolf numbers and distribution to ensure the

---

[4]  https://widnr.widen.net/s/tlkjlrrhr7/wisconsin_gray_wolf_report_2023 (last visited August 28, 2024). This is a winter population estimate and is also likely to be low. The number is likely closer to 1,200 as of January 2024. https://www.usnews.com/news/best-states/wisconsin/articles/2024-01-25/wisconsin-assembly-approves-a-bill-mandating-a-limit-on-the-wolf-population-sends-proposal-to-evers (last visited August 28, 2024).

[5]  https://files.dnr.state.mn.us/wildlife/wolves/2023/survey-wolf.pdf (last visited August 28, 2024). This was also a mid-winter estimate, which is the time of year when the wolf population is at its lowest.

long-term survival of gray wolves in the Eastern United States." *Id.*

46.   In 2003, the Service promulgated a rule dividing wolves into three distinct population segments: an Eastern and Western DPS, both of which were downlisted as threatened, and a Southwestern DPS, which remained listed as endangered. *See* 68 Fed. Reg. 15,804 (Apr. 1, 2003). That rule was vacated by two district courts. *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior,* 354 F. Supp. 2d 1156 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton,* 386 F. Supp. 2d 553 (D. Vt. 2005).

47.   In 2007, the Service promulgated another rule establishing a Western Great Lakes DPS, encompassing "all of Minnesota, Wisconsin, and Michigan; the eastern half of North Dakota and South Dakota; the northern half of Iowa; the northern portions of Illinois and Indiana; and the northwestern portion of Ohio" and removed ESA protections for those wolves. 72 Fed. Reg. 6052, 6052 (Feb. 8, 2007). That rule was vacated. *Humane Society of U.S. v. Kempthorne,* 579 F. Supp. 2d 7 (D.D.C. 2008).

48.   The Service reissued that rule in 2009. 74 Fed. Reg. 15,070 (Apr. 2, 2009). But it did so without public notice and an opportunity to comment. That rule was vacated and remanded by a stipulated settlement agreement. *See Humane Soc'y of the United States*, 76 F. Supp. 3d at 96 (citing *Humane Soc'y of the U.S. v. Salazar,* No. 09-cv-1092 (D.D.C. July 2, 2009), ECF No. 27).[6]

---

[6] At this time the Service designated the wolf population in Idaho, Montana, Wyoming, a portion of North-Central Utah, and Eastern Oregon and Washington as the Northern Rocky Mountain Distinct Population Segment and simultaneously delisted that population, except for the Wyoming population, which remained listed. 74 Fed. Reg. 15123 (Apr. 2, 2009). That delisting was vacated. *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010). But before the appeal of that decision was completed, Congress passed and the President signed an appropriations bill that directed the Service to reinstate the 2009 Delisting Rule. Pub. L. 112–10, 125 Stat. 38 (2011). The appropriations bill was challenged and upheld. *All. for the Wild Rockies v. Salazar*, 800 F. Supp. 2d 1123 (D. Mont. 2011), *aff'd*, 672 F.3d 1170 (9th Cir. 2012). The Service then delisted Wyoming's wolves in a separate rulemaking, 77 Fed. Reg. 55530 (Sept. 10, 2012), which was upheld. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017).

49.    The Service again promulgated a rule designating and delisting the Western Great Lakes DPS wolves. 76 Fed. Reg. at 81,666 (Dec. 28, 2011). That rule was vacated because the Service failed to consider how delisting the Western Great Lakes wolves would affect the remnant population of wolves and the loss of the wolves' historic range. *See Humane Society of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017).

50.    The Service then delisted gray wolves in the conterminous 48 states in 2020. 85 Fed. Reg. 69778 (Nov. 3, 2020). That rule was vacated by a district court. *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812 (N.D. Cal. 2022). The parties appealed that decision, and the Ninth Circuit mediator "issued an order temporarily staying the appeals for administrative purposes until February 2, 2024. During the abeyance, the Service is updating the status review for the gray wolf throughout the lower 48 United States and commencing a stakeholder engagement effort." 88 Fed. Reg. 75506, 75507 (Nov. 3, 2023). The Service also intended to submit a proposed rule regarding the status of wolves in the lower-48 states to the Office of the Federal Register "[b]y February 2, 2024." *Id*. at 75508. It never published that proposed rule. It contracted with a firm to conduct the engagement effort in December 2023.[7] That "contract extends through September 2026, which indicates that [the engagement contract's] work will be used to develop [the Service's] national wolf recovery plan."[8]

### PLAINTIFFS' PETITIONS

51.    On June 29, 2023, Plaintiffs filed two petitions with the Service. The Service's Environmental Conservation Online System website shows that it received the petitions on June 29, 2023.[9]

---

[7]https://www.fws.gov/press-release/2023-12/national-dialogue-initiated-working-landscapes-and-gray-wolves (last visited August 29, 2024)

[8] https://www.outdoorlife.com/hunting/wolf-management-mediator/ (last visited August 29, 2024)

[9] https://ecos.fws.gov/ecp/report/table/petitions-received.html (last visited July August 29, 2024).

52.    The first petition asked the Service to designate and delist a Western Great Lakes Distinct Population Segment of gray wolves. The second petition asked the Service to recognize a West Coast Wolf Distinct Population Segment, to downlist that West Coast DPS from endangered to threatened, and to keep any other remnant wolf populations listed.

53.    More than a year after the petitions were filed, the Service has not made any 90-day or 12-month findings on those petitions. It acknowledges this on its Environmental Conservation Online System: "Petition findings not yet made." *See* n. 9 *supra*. It also acknowledged this in its August 13, 2024, letter.

54.    Plaintiffs sent a notice of intent to sue the Service after it missed the 90-day finding deadline on November 10, 2023. On March 6, 2024—nearly five months after the notice was sent and over five months after the 90-day deadline passed—Plaintiffs received a three-paragraph response from the Service stating, *inter alia*, that "[t]he 90-day findings for these petitions are among our outstanding workload, and the Service will complete our review as soon as possible. The Service requests that you please refrain from filing suit at this time."

55.    On July 2, 2024, Plaintiffs sent another notice of intent to sue the Service via electronic and certified mail.

56.    In its August 13, 2024, letter, the Service acknowledged that it received the notice of intent to sue on July 2, 2024. It again acknowledged that the 90-day and 12-month findings have not been made. And it again "ask[ed] that you please refrain from filing suit at this time."

**FIRST CLAIM FOR RELIEF**
**(Failure to timely make 90-day findings)**

57.    Plaintiffs reallege and incorporate by reference all allegations in the proceeding paragraphs of this Complaint.

58.    It has been more than a year since Plaintiffs submitted their petitions to the Service, and

14

the Service has failed to make 90-day findings on those Petitions.

59.    The Service has therefore violated its mandatory, non-discretionary duty under § 4 of the ESA. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1).

60.    By failing to timely make the 90-day findings, the Service has "unlawfully withheld or unreasonably delayed" a non-discretionary "agency action" under the APA. 5 U.S.C. §§ 551(13), 706(1).

## SECOND CLAIM FOR RELIEF
### (Failure to timely make 12-month findings)

61.    Plaintiffs reallege and incorporate by reference all allegations in the proceeding paragraphs of this Complaint.

62.    It has been more than a year since Plaintiffs submitted their petitions to the Service, and the Service has failed to make 12-month findings on those Petitions.

63.    The Service has therefore violated its mandatory, non-discretionary duty under § 4 of the ESA. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(h)(1).

64.    By failing to timely make the 12-month findings, the Service has "unlawfully withheld or unreasonably delayed" a non-discretionary "agency action" under the APA. 5 U.S.C. §§ 551(13), 706(1).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

A.  Declare that Defendants have violated the ESA by failing to timely make 90-day and 12-month findings on Plaintiffs' petitions;

B.  Declare that Defendants have acted contrary to law and unlawfully withheld and unreasonably delayed agency action in violation of the APA by failing to timely make a 90-day and 12-

month finding on Plaintiffs' petitions;

C.   Issue an injunction, order, or other similar judicial relief compelling Defendants to make a 90-day and a 12-month finding on the petitions within a reasonable date certain, and promptly publish such finding in the Federal Register;

D.   Award Plaintiffs their costs of litigation, including reasonable attorney's fees in accordance with the ESA, 16 U.S.C. § 1540(g)(4), the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable law; and

E.   Grant such further and additional relief as this Court deems just and proper.

Dated September 9, 2024                     Respectfully Submitted:

/s/
Michael T. Jean (MI Bar No. P76010)
Sportsmen's Alliance Foundation
801 Kingsmill Parkway
Columbus, OH 43229
(248) 508-9765
MJean@sportsmensalliance.org

*Counsel for Plaintiff Sportsmen's Alliance Foundation*

/s/
Daniel R. Olson (MI Bar No. P64603)
Gielow Groom Terpstra & McEvoy, PLC
281 Seminole Road
Norton Shores, MI 49444
(231) 291-0111
daniel@ggtmlaw.com

*Counsel for Plaintiffs*